MORGAN & WRIGHT, Appellants, v. SUTLIVE BROS.,
Appellees.

**Contracts:** CORRESPONDENCE: EVIDENCE. In this action for the price
1  of goods manufactured for defendant the correspondence of the
parties is held to constitute a binding contract.

**Same:** SUBMISSION OF ISSUE. Where the whole contract for the
2  manufacture of goods was embodied in the correspondence be-
tween the parties, as in this case, and was that plaintiff should
give defendants' orders for goods their best attention, it was
error for the court to submit to the jury the question of what
plaintiff agreed to do, in an action by them for the price of goods
delivered.

**Sales:** BREACH OF CONTRACT: RECOVERY UPON COUNTERCLAIM: INSTRUC-
3  TION. Where plaintiffs' contract for the manufacture of goods
was embodied in the correspondence of the parties, which conclu-
sively showed that plaintiff was simply to give defendants' orders
their best attention, an allowance by the jury upon defendants'
counterclaim for delay in delivery was unauthorized, in the ab-
sence of any evidence of a breach of the contract, and was a
violation of an instruction that to recover upon the counterclaim
defendant must show by a preponderance of the evidence that
plaintiffs failed to comply with their agreement.

**Same:** SUBMISSION OF ISSUES: UNDISPUTED EVIDENCE. Where but one
4  finding on a question of fact is possible under the evidence the
issue should not be submitted to the jury. Thus where defendant
in an action for the price of manufactured goods counterclaimed
for delay in delivery, and the correspondence between the parties
showed conclusively that defendant had canceled his order and
that plaintiff had assented thereto, it was error to submit the
question of cancellation.

**Same:** DAMAGES: LOSS OF PROFITS: EVIDENCE. Loss of profits as an
5  element of damage are not to be rejected in all cases as neces-
sarily uncertain and speculative; but where they are clearly un-
certain, speculative, and not reasonably within the expectation of
the parties, they can not be considered because incapable of ade-
quate proof. In this action for the price of manufactured goods
in which defendant counterclaimed for delay in delivery, the evi-

dence is held to show that defendant's claim for loss of profits which would have accrued had the goods been promptly delivered was too unreasonable and uncertain to constitute an element of damage, and that the same was not contemplated by the parties as an element of damage resulting from the delay.

**Same.** The acceptance by a buyer of a delayed shipment of goods is not necessarily inconsistent with a claim for damages caused by such delay, but is inconsistent with a claim for damages for complete loss of profits upon all the goods ordered.

**Same:** BREACH OF CONTRACT: WAIVER OF DAMAGES. Where a buyer of manufactured goods to be shipped in installments requests a cancellation of his contract and all outstanding orders, which is assented to by the manufacturer, and in response to a statement of the balance due from him forwards his check in settlement he waives any claim for damages growing out of delay in delivery of the goods, and can not plead such damages as a counterclaim in a suit for the price of goods subsequently ordered and received.

*Appeal from Keokuk Superior Court.*—Hon. W. L. Mc-Namara, Judge.

Tuesday, April 12, 1910.

Plaintiffs brought this action on account for goods sold and delivered to the extent of $107. The account was admitted by the defendants and a counterclaim for .$8,000 was set up as alleged damages for breach of contract. There was a general verdict for the defendants for $3,000, and judgment was entered thereon. Plaintiffs appeal. *Reversed* and *remanded.*

*Hollingsworth & Blood,* for appellants.

*F. T. Hughes* and *W. J. Roberts,* for appellees.

Evans, J.—The negotiations and transactions involved in this suit began in October, 1900, and ended in January, 1903. The plaintiffs were manufacturers of rubber goods.

The defendant B. E. Sutlive was doing business under the name of Sutlive Bros., purporting to consist of himself and two brothers. The brothers deny all interest in the purported firm, and in our discussion of the case B. E. Sutlive will be referred to as the defendant. The defendant had been engaged for some time in selling a certain device known as a pillow ventilator. It was a spool-shaped device, which was inserted in the covering of the pillow in such a way that the feathers therein should be ventilated by the passage of air through the opening in the spool. This device is referred to in the correspondence between the parties as a rubber spool. These spools were manufactured for the defendant by the plaintiffs, and they constituted the first stage in the completed device. After the spool was received from the plaintiffs, certain further labor was bestowed upon it by the defendant to prepare it as a completed device for the market, and this consisted principally in covering the opening thereof with a web so constructed as to permit the passage of air and prevent the escape of the pillow feathers. The parties had been dealing together for some years prior to the transactions involved in this case.

On October 30, 1900, the defendant wrote to the plaintiffs proposing to order 1,000,000 spools at $2.85 per thousand, one half of which should be delivered in 1901 as follows: January 1, 1901, 75,000, March 1, 1901, 75,000, May 1, 1901, 75,000, July 1, 1901, 75,000, September 1, 1901, 75,000, November 1, 1901, 75,000, December 1, 1901, 50,000, and the other one half to be delivered in the same manner in the year 1902, subject to the right of countermand by the defendant. On November 1st the plaintiffs replied to this letter by declining the proposition. Their letter, however, contained the following: "We will accept your order for 500,000 spools to be delivered as you specify during the year 1901 at a price of $2.85 per thousand, but under no circumstances could

we make a better price." To this letter, the defendant, on November 2, 1900, replied as follows: "Your letter of the 1st at hand and you may enter our order for 500,000 rubber spools at $2.85 per thousand to be delivered during the year 1901. Please send balance of old order as fast as you can." This order was repeated on November 3d, and its receipt was acknowledged by the plaintiff under date of November 7th. Pursuant to this order plaintiffs shipped to the defendant during the year 1901 a total of 359,275. The rate of delivery was in substantial compliance with the contract up to the last of August, 1901, except that no shipment was made in March, and only 15,529 were shipped in April. Nearly 78,000 were shipped in January and February, and more than 75,000 were shipped every sixty days during May and June, July and August. Some complaints were made by the defendant during the summer months because of shortage in receipts, but the defendant himself was usually in arrears in payment for the goods actually received when such complaints were made. On September 9, 1901, while such arrears of payment continued, the defendant wrote to plaintiffs as follows: "We received your statement, and anticipating draft may follow in a few days, would ask that you kindly give us chance to remit about the 15th or 20th inst. The few days would enable us to make better connection, and thanking you in advance for the favor, we remain." Again on October 11, 1901, he wrote as follows: "Replying to your letter just to hand, we will wait until the 20th of the month again to remit, if this will be satisfactory to you. If our remittances are not coming fast enough, it might be well to allow a little longer time between shipments for a month or so. Our advertising season is now on and we can use the cash a good deal faster than the goods. We hope this will be satisfactory, and remain."

The deliveries for September, October, November, and

December were 113,627 instead of 300,000 as specified in defendant's original proposition. The deliveries, however, continued after the close of the year 1901 by the mutual acquiescence of the parties. On February 7, 1902, the defendant wrote to the plaintiffs as follows: "You knocked us out when you quoted the rubber spools at $2.85. We have tried hard to build up a trade on this article by advertising it, but such a thing as a 'demand' is, in our opinion, an impossibility. The advertising must keep up or the orders stop short. We didn't make a dollar on it last year. If we advertise further, we must get concessions from the newspapers on the basis of larger orders for advertising, and must then handle the metal spool, or get the rubber article cheaper. You once made them for us at $2.70. We are now trying to get one million for $2.50 per thousand and would take 100,000 every sixty days. If we do not succeed, the stock on hand of rubber and metal, together with those coming to us from order now in your hands, will do us indefinitely. You have been accommodating to us, for which we thank you." The deliveries by plaintiffs from January 1, to May 1, 1902, aggregated nearly 75,000. During this period, some correspondence passed between the parties looking to a new order. The material part of this correspondence was that the defendant proposed a lower price, which proposition was declined by the plaintiffs. On May 1, 1902, the defendant wrote to the plaintiffs as follows: "We inclose check for $99.75, as per invoice March 10th. Your price of $2.85 on a new lot of these goods is a little higher than we would have to pay, but it is an accommodation to us to get the spools at the same rate of delivery as last order, and you may enter our order for another five hundred thousand at $2.85 per thousand, price and other condition being the same as on the former five hundred thousand. We have about 125,000 yet on hands, but you can ship right along just the same until order is completed. We

shall expect the new lot to be like those you have shipped the last two or three times, and this condition is included in our order." To this letter no response was made by plaintiffs until a second letter calling attention thereto was written by the defendant to the plaintiffs on May 12th. Thereupon, on May 13, 1902, plaintiffs replied as follows: "Sutlive Bros., Keokuk, Iowa. Gentlemen: We duly received your favor of the 12th inst., and now beg to acknowledge receipt of your valued order and remittance of $99.75 under the date of the 1st. We appreciate your kind favors and your order shall have our best attention. Our failure to acknowledge your favor was simply an oversight, which, you know, will occur occasionally in the rush of business. Again thanking you, we remain, with best wishes. Yours very truly, Morgan & Wright."

After May 1, 1902, 152,000 were delivered by plaintiffs. On November 1st a strike of laborers went into effect, and the plaintiffs' factory was closed and picketed, and so continued to the end of the year. On December 19, 1902, the defendant wrote the plaintiffs as follows: "Dear Sirs: We inclose check for $85.45 in payment of the items enumerated in inclosed statement. In a recent letter you advise us your draft for this amount was returned to you, but if so it was returned by the 'candy side' of our business—we did not see your draft. We did not expect to be drawn on, either, in view of the fact that your failure to ship us goods has cut off our source of revenue. This branch of our business is obliged to pay all its own bills, and the strike has cost us in delays, several hundreds of dollars. As we are afraid we can not use the 500,000 spools ordered about May 1st, last, you may cancel our order, and if we 'recuperate' we may place another order with you. If you could manage to ship our molds at once to the B. F. Goodrich Company, Akron, Ohio, you would ablige us. They have made us a price on 30,000 spools. If you could make the 30,000 spools

at once, you could enter our order for this number at $2.85 per thousand, but please cancel our order for 500,000. Yours very truly, Sutlive Bros." This cancellation of the order was assented to by plaintiffs under date of December 23d. The defendant bases his claim of breach of contract and damages therefor upon the delays in delivery. He claims that the plaintiffs were in arrears in delivery to the amount of 140,000 for the year 1901, and to the amount of 150,000 for the year 1902 up to the date of the cancellation of the order. His claim, in brief, is that if he had received the full amount of his order on the specified dates, he could have sold the same at a profit of $16 per thousand, and this is the alleged basis and measure of his damages. On this basis he counterclaimed for $8,000 damages, and recovered a verdict for $3,000. The foregoing statement will suffice for the moment to enable us to consider some of the instructions which are complained of by appellant.

I. There is considerable argument on the question whether the correspondence set forth constituted contracts between the parties. The trial court instructed the jury that the correspondence had, in the fall of 1900, amounted to a contract for the manufacture and delivery of 500,000 spools on the dates specified in the defendant's original proposition. We think this holding was correct. Appellant complains because the court ignored a certain letter of November 7th from the plaintiffs to the defendant, wherein they acknowledged the receipt of his order, and stated therein that the same "is having our best attention." This letter does not purport to qualify the contract in any way. In this case the plaintiffs themselves had made the offer in their letter of November 1st, and the defendant's letter of November 2d was an unqualified acceptance, and this was sufficient to complete the contract.

1. CONTRACTS: correspondence: evidence.

As to the second contract, the court instructed the

jury by instruction No. 5 as follows: "If from the evidence under the instructions of the court the jury finds that all the plaintiffs, Morgan & Wright, agreed to do in connection with the alleged so-called second contract which it is claimed was made by the correspondence between the plaintiffs and defendant from January 24, 1902, to May 1, 1902, inclusive, was to give the orders of Sutlive Bros., under same their best attention, then it is incumbent upon the defendant, Sutlive Bros., to show by a preponderance of the evidence that the plaintiffs did not give the said order their best attention; and, unless you so find, your verdict must be for the plaintiffs as to this portion of the said counterclaim." The court was not justified in permitting the jury to determine what it was that "Morgan & Wright agreed to do in connection with the alleged so-called second contract." The whole contract was contained in the correspondence above set forth, and the trial court should have instructed the jury as to the effect of it.

In this second contract the undertaking of the plaintiffs was to give the order of the defendant "their best attention." There was no room for any other finding, either by court or jury. If the jury had followed this instruction, it must have eliminated defendant's claim for damages under the second contract, because there was no evidence to show that the plaintiffs had not complied with their undertaking in that respect. The verdict rendered was therefore in clear conflict with this instruction.

There is some question of dispute as to the dates of delivery involved in the second contract. The correspondence provided generally that other conditions should be the same as the former order. This provision, however, could not literally be carried out. The former order provided for deliveries on January 1st, March 1st, and May 1st,

*2. SAME: submission of issue.*

*3. SALES: breach of contract: recovery upon counterclaim: instruction.*

and these dates had already gone by before the order was accepted by the plaintiffs. It might be construed to apply to the subsequent dates of the former order such as July 1st, September 1st, November 1st, etc. A delivery of 150,000 would answer the call for July 1st and September 1st. The subsequent correspondence, however, between the parties contemplated that deliveries under the new order should not commence until after the deliveries under the 1901 contract should be completed. The defendant treated the deliveries made in 1902 as having been made under the 1901 contract. After the letter of February 7, 1902, and before the strike, the defendant did not at any time complain of delay in shipment, nor was he at any time free from arrears in payment. But he did, however, write letters requesting shipment under the following dates: August 1st, September 11, September 25, and October 22, 1902, and substantial shipments were made in each case in response to such request.

II. The court gave the jury the following instruction No. 4: "If from the evidence under the instructions of the court the jury finds that the defendant Sutlive Bros., on or about December 19, 1902, requested the plaintiffs, Morgan & Wright, to cancel the said so-called second contract, and if you find that the plaintiffs acquiesced in said request and canceled said contract, then, if you so find, plaintiffs, Morgan & Wright, were under no obligations to furnish further spools under said contract, and plaintiffs can not recover for any failure to deliver spools after the cancellation of said contract." There was manifest error in the giving of this instruction. The request of defendant for a cancellation of the contract was contained in his letter of December 19, 1902, and the plaintiffs' assent thereto was contained in their letter of December 23d. Both letters were clear and unequivocal in this

4. SAME: submission of issues: undisputed evidence.

respect, and had the undoubted effect to cancel the order, and the jury should have been so instructed.

The defendant's counterclaim claimed for an alleged failure of delivery of 492,000 spools, and this was the claim submitted to the jury in the statement of issues by the court. The theory of the defendant at this point was that all the deliveries that had been made after May 1st were first applied upon the former contract, leaving 8,000 to be applied upon the second contract. Not only had the plaintiffs delivered over 152,000 after May 1st, but they had delivered also nearly 75,000 between January 1, 1902, and May 1, 1902, before the second contract was entered into. In his theory of the case the defendant quite ignored the delivery of the 75,000 after January 1st and before May 1st, because his damages were alleged to have accrued by the delay previous to such delivery. Under this method of computation urged by the defendant the plaintiffs were in default in delivery to the amount of 492,000. This theory on the part of the defendant took no account of the cancellation of the order. It is true that defendant's counsel do not in this court claim on that theory. Their argument here is based upon the theory that there was shortage of 140,000 under the first contract and of 150,000 under the second. Clearly the jury should have been instructed that the second contract was canceled in December, 1902, by the correspondence referred to.

III. On the question of the measure of damages the trial court instructed the jury that the defendant could

5. SALES: damages: loss of profits: evidence.

not recover for loss of profits unless they should find that "such loss of profits was fairly contemplated by both parties as a probable result or consequence of the failure of the plaintiffs to deliver said spools at the time and in the quantities named in said contract, and that such contract was entered into in contemplation of such consequences following a breach thereof." The implication of this instruction was

that, if the affirmative of the foregoing proposition was proved, then such loss of profits was the measure of damages. Except such · implication, no other rule of measure of damages was stated. The jury was told to "take into consideration 'all the evidence relating to the price at which the goods were to be furnished and the prices at which the same were to be resold, and what it would cost to handle and sell such spools as disclosed by the evidence," and also that "any profits which you may allow as damages must be shown by the evidence to be reasonable and certain. Uncertain and speculative profits which might possibly have been made from the sale of feather ventilators manufactured from spools, if any, which you may find from the evidence should have been, but were not, delivered by the plaintiffs to the defendant, can not be considered by you as damages." The only testimony on the question of loss of profits was that of the defendant himself. After testifying that he had sold in the year 1901 about 320,000, the following testimony was received over abundant objection to each question and answer:

Q. 43. State if you had received 500,000 during the aforesaid year from January, 1901, to January, 1902, in lots of 75,000 every sixty days, you could have sold that many in your territory. A. I certainly could have sold the goods if I had gotten them. Q. 44. State how many you could have sold during that year had you received them in lots of 75,000 the 1st day of January, 1901, and 75,000 on the first day of every other alternate second month thereafter in 1901. A. I could have sold at least 500,000 ventilators during the year 1901. Q. State if you had received 180,000 more, could you have sold them also? A. Yes; I could. Q. State what your profits would have been on the 180,000 that you did not receive or sell, if you had received them and sold them. A. The profit would have been $16 per thousand on 180,000 that I did not receive. Q. If you had received during the period from May 1, 1902, to December 31, 1902, 300,000 spools, state whether or not could have sold all of them. A. I could

have sold all of them.   Q. You say that you received 152,398 spools in that year, if you had received 148,000 more during that period, state whether or not you could have sold them.   A. I certainly could have sold them.   Q. State what your profits would have been on the 180,000 which you say you could have sold, had you received them and sold them.   A. My profit on the 148,000 more, if I had received them, would have been $16 per thousand. Q. State whether or not if you had received them in those quantities and at those times you could have sold the 148,000.   A. I could have sold them.

We will not deal now with the technical accuracy of the instructions at this point.   It is sufficient for our present consideration that, if these instructions had been followed, the defendant could not have recovered.   And if but one finding was possible at this point, then the court should have made it, and should not have submitted it to the jury as an open question at all.   The price to be paid the plaintiffs was $2.85 per thousand.   The claim of the defendant is that, after incurring certain additional expense thereto, he could have sold them all at a profit of $16 per thousand.   This is an alleged profit at something over 500 percent above the price to be paid the plaintiff. Can it be said upon this record that such profit was "reasonable" and "certain," and "within the contemplation of the parties?"   Such alleged profit was not to be made upon a resale of the goods as received from the plaintiffs, but upon the goods as they would be after further labor and expense had been incurred thereon.   Granted that ordinarily the question of what would be reasonable and certain as profits is a question of fact, yet there must be purported evidence upon which to base a finding.   We think such purported evidence is wanting in this record. The evidence of the defendant upon that question is clearly "uncertain and speculative," nor do we see how it can be said, upon mere implication or inference, that such an

extravagant profit could have been within the contempla-tion of plaintiffs when they entered into the contract, much less that they could have deemed themselves as liable for damages to such an amount for mere delay in delivery. On the contrary, we think that the whole tendency of the evidence which consists of the correspondence of the parties is to show that damages of such a nature were never con-templated by either party. The proof of the damage for alleged loss of profits rests wholly upon the opinion of the defendant above quoted. This opinion is supported by no data whatever. The only pretense of data offered as a basis for such opinion is the statement of the witness that he actually sold about 320,000 in the year 1901, and the further statement that in January, 1901, he was then selling an average of "30,000 or 40,000 per month." He actually received from the plaintiffs an average of 30,000 for the whole year. In September and October he had sufficient on hand that he asked for more time between shipments in order to enable him to pay. On February 7, 1902, he wrote that he had enough on hand to last him "indefinitely." On May 1, 1902, he wrote that he had 125,000 on hand. Between January 1 and May 1, 1902, he had received a little less than 75,000. He must have had on hand, therefore, at the close of the year 1901, not less than 50,000, taking no account of any sales made between January, 1902, and May, 1902. If he made any sales within that period, the amount of such sales repre-sented an excess of over 50,000 on hand at the close of the year 1901. But if he made no sales, it only emphasizes the uncertainty of his trade when he had goods on hand. The effect of defendant's own testimony is that his opinion as to the amount of lost profits is wholly unsupported by any proper data.

The rule as to loss of profits is that they are not to be rejected as being necessarily uncertain and speculative,

but, when they are in fact uncertain and speculative in a given case, they cannot be considered because incapable of adequate proof. This question is quite fully discussed in *Hichhorn v. Bradley,* 117 Iowa, 130. See, also, *Howe v. Boyson,* 44 Iowa, 159; *Winnie v. Kelley,* 34 Iowa, 339; *Bank v. Thurman,* 69 Iowa, 693; *Manufacturing Co. v. Creamery,* 120 Iowa, 584; *Wakeman v. Wheeler,* 101 N. Y. 205 (4 N. E. 264, 54 Am. Rep. 676); *Central Coal Co. v. Hartman,* 111 Fed. 96 (49 C. C. A. 244); *U. S. v. Behan,* 110 U. S. 338 (4 Sup. Ct. 81, 28 L. Ed. 168.) We are clearly of the opinion that the alleged profits claimed in this case were not shown by any proper proof. The opinion of the defendant was the merest guess, without any data to support it. The profits claimed by him, both by his pleading and by his evidence, are so enormous and exaggerated as to be clearly speculative and beyond the ordinary contemplation of any contracting party. Indeed, it is plainly manifest from the defendant's correspondence that he himself never contemplated such alleged loss of profits as basis for a claim of damages.

His claim is now based upon mere delay in delivery. If there had been failure on the part of plaintiffs to deliver at all, at any time, the defendant's damage could be no greater than he now claims for the delay alone. His theory is that he became en-

6. Same.

titled to such damages immediately when the delay occurred, and that the breach was not healed by a subsequent delivery. If, however, he had claimed such damages at such time, the payment thereof by the plaintiffs would have excused them from any further performance of the contract. The defendant could not, as a matter of right, claim these damages for delay and claim later performance also. Without making any claim for such damages at any time the defendant requested and received a continuance of the deliveries after the expiration of the year 1901. While an

acceptance of delayed performance is not necessarily inconsistent wtih a claim for damages caused by the delay, it is inconsistent with a claim of damages for complete loss of profits. The plaintiffs could not be required to pay him his full estimated profits as damages, and then be required to make the delivery of the goods at a later date, in order that additional profits might be made therefrom. We are referring now only to the first contract, wherein the undertaking of plaintiffs was more absolute than in the second. We think it must be said that it appears conclusively from the correspondence that the measure of damages now claimed was not within the contemplation of either party; and, further, that if it was, it was clearly waived by the defendant by his subsequent conduct.

After the cancellation of the second contract in December, 1902, the plaintiffs on January 19, 1903, sent the defendant a statement for a purported "balance" due the plaintiffs amounting to $92.66. The defendant and responding, under date of January 26th wrote: "We inclose check for $92.66 to balance 1902 account as per statement." On January 29, 1903, he wrote again: "We wrote you on the 26th inclosing check for $92.66 to balance 1902 account." This was the final adjustment of all the business between the parties under the contracts of 1901 and 1902, and no suggestion had yet ever been made by the defendant of any offset for damages. In January, 1903, the defendant placed a new order with the plaintiff for 25,000, which the plaintiffs shipped promptly. This order was never paid for, and is the order upon which suit was brought, and against which the counterclaim has been set up. It should be noted that this correspondence of January, 1903, was preceded by a mutual agreement between the parties in December, 1902, canceling the outstanding orders of the defendant. This agreement was made in pursuance of the

7. SAME: breach of contract: waiver of damages.

request of the defendant. The defendant may have been entitled as a matter of law to make such cancellation without the consent of the plaintiffs. He did not claim such right. He did request their consent to such cancellation and obtained it. The effect of this agreement was necessarily a termination of all further obligations of the parties to each other under the previous contracts. Taking the record before us, the conclusion is unavoidable that the verdict rendered was a grave miscarriage of justice. Plaintiff's motion to set the same aside should have been sustained. The foregoing discussion discloses our view, also, that upon the record as made a verdict ought to have been directed for the plaintiffs. Upon this appeal, however, we can do no more than to order a new trial.

IV. The appellee moves to affirm the judgment in this case because of the failure of appellant to conform to the rules of this court in the preparation of abstract and argument. It must be said that appellant's abstract and argument are fairly subject to criticism. We do not think, however, that an affirmance would be justified on that account. We think a sufficient penalty can be imposed by proper order for the taxation of costs. It will be the order of the court that appellants recover only one-half their taxable costs for printing in this court.

The judgment of the court below will be *reversed,* and the case *remanded.*