Syllabus.

## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## EASTERN SHORE OF VIRGINIA PRODUCE EXCHANGE v. THE NEW YORK, PHILADELPHIA AND NORFOLK RAILROAD COMPANY.

### February 26, 1925.

1. CARRIERS—*Implied Agreement to Carry Safely and Deliver Within a Reasonable Time.*—The implied agreement of a common carrier is to carry safely and deliver at destination within a reasonable time.

2. CARRIERS—*Contract to Deliver Within a Particular Time—Expediting or Delaying Shipments—Publication of Rate for such Service—Elkins Act.*—A railroad company may make a contract with a shipper to deliver within a particular time, but to do so under the Elkins act (32 U. S. Stat. at L. 647, chapter 708, section 1 [1]; U. S. Comp. St., section 8597) it must publish a rate open to all. To make a special contract otherwise is to extend an advantage to one not extended to all, and for breach of such a contract relief will be denied. A contract to delay shipment in order that the shipper may catch a more favorable market is also a discrimination and as such a violation of the Elkins act.

3. CARRIERS—*Delaying Shipment to Catch more Favorable Market—Elkins Act—Usages and Customs.*—The possibility of discrimination between shippers, to delay one shipper's goods and to forward another's, is as great in case of a contract to delay delivery as it is in case of a special contract to expedite. It is clearly unlawful and custom could not make it lawful.

4. CARRIERS—*Conversion—Diversion—Failure to Divert—Order for Diversion Really an Order for Delay in Delivery—Case at Bar.*—A shipper's right to divert, and to recover such damages as result from a failure to divert, is unquestionable. The failure to execute a *bona fide* order to divert would, in many cases, amount to a conversion. But in the instant case the socalled order to divert was nothing more than an order to delay completion of the transportation for two days, in order to reach destination on a more favorable market, and the carrier's failure to comply with the order did not amount to a conversion.

5. CARRIERS—*Conversion—Measure of Damages.*—The correct measure of damages for conversion by a common carrier is the market value of the property at the place of destination at the time converted.

6. CARRIERS—*Conversion—Case at Bar.*—In the instant case a shipper of cabbage to New York requested that the shipment should be diverted to Jersey City. It was apparent that the so-called order to divert was nothing more than an order to delay completion of the transportation for two days in order to reach destination on a more favorable market.

*Held:* That even if the failure to execute the order of diversion amounted to a conversion by the carrier, the plaintiff suffered no damages which the law would sustain, as the market price of cabbage at Jersey City was governed by the market price at New York city, which plaintiff received upon a sale at the latter city on the date of the alleged conversion.

Error to a judgment of the Circuit Court of Accomac county upon a notice of motion in the sum of $672.34 by Eastern Shore of Virginia Produce Exchange, hereinafter designated as plaintiff, against the New York, Philadelphia and Norfolk Railroad Company, hereinafter designated as defendant, for damages. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*S. James Turlington,* for the plaintiff in error.

*Geo. R. Allen* and *Stewart K. Powell,* for the defendant in error.

CHICHESTER, J., delivered the opinion of the court.

On May 13, 1921, plaintiff shipped over defendant's and the Pennsylvania Railroad lines two carloads of cabbage consigned to A. E. Meyer & Company, pier 29, New York city. Car N. Y. C. No. 141441 containing 240 crates was loaded at Bayview, Va., and car P. L. No. 608523 containing 250 crates at Cheriton, Va.

W. C. Jacobs, who represented the consignees in

Accomac county, learned, after the two cars had been billed out, that a heavy shipment of cabbage was enroute from Norfolk, Va., to New York, and would arrive there in time for the market of Monday, May 16, the time the two above mentioned carloads of cabbage were due to arrive.

He, therefore, on Saturday, May 14th, had W. T. Gardner, traffic manager for the plaintiff, get in telephonic communication with George W. Rush, division freight agent of the Pennsylvania Railroad Company, Wilmington, Del., and requested that both cars of cabbage be "diverted" to Jersey City. It was understood that the diversion order, which was given in time, would be accomplished as requested. It had been the custom for a long time to give these so called diversion orders to Jersey City (which were in reality not diversion orders at all, but were requests to hold up or delay shipments in Jersey City for reshipment to New York, for a prospectively more favorable market), and these requests, if given in time, were as a rule carried out by the railroad company.

On this occasion, for reasons not disclosed by the record, the diversion was not accomplished. The two carloads of cabbage reached pier 29, New York, in time to be unloaded and sold on Monday, May 16th, and they were sold at the prevailing market price that day, of from $2.25 to $2.50 per crate. There are no, or very limited, track facilities at pier 29, and plaintiff contends that this fact made it necessary to unload and sell immediately. It further contends that if diversion had been accomplished, as requested, the cabbage would have been held in the freight cars in Jersey City, without demurrage charges, for two days, that is, until the following Wednesday, May 18th, market, reshipped without unloading to New York city, and sold on that

market, at which time the price for cabbage was about one dollar per crate higher than it was on Monday, the 16th. There is no market at Jersey City. The prices there being determined by the New York market.

The notice of motion for judgment sets out specifically the reasons for requesting the diversion, and claims damages in the sum of $672.34. The jury, upon the issue joined, after hearing the evidence and being instructed by the court found a verdict for the plaintiff in the sum of $416.50.

Upon motion by defendant's counsel to set aside the verdict as contrary to the law and the evidence and for misdirection of the jury by the court, and to enter judgment for the plaintiff, the court sustained the several motions, set aside the verdict, and entered judgment for the defendant.

The propriety of this action of the trial court is before us for review.

The ground upon which the plaintiff seeks to recover is that there was a conversion of the cabbage by the railroad company. The basis of this claim of conversion is the alleged order of diversion to Jersey City, New Jersey, the failure to divert, and delivery in New York for the market on Monday, May 16. As a matter of fact, according to the admission of the plaintiff in its pleadings and in its evidence, there was never a *bona fide* diversion order. The so-called diversion order was nothing more or less than a request to delay the shipment in Jersey City for two or three days and then deliver it in New York, and the effect of the order was to use defendant's freight cars for warehouse or storage purposes in Jersey City until a more favorable market obtained in New York City. It is true, we think, that the record establishes the fact that the Pennsylvania Railroad authorities had long been complying with such

requests on the part of the plaintiff, and that they knew the purpose of the requests; but that it was under any legal obligations, as a carrier, to comply, or that a failure to comply amounted to either a conversion of the cabbage or a breach of duty, we cannot agree.

In *Chicago and Alton Railroad Company* v. *Kirby*, 225 U. S. 155, 32 S. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914-A, 501, it was held that for a railroad company to agree with a particular shipper to expedite a shipment at regular rates, where no rate had been published for special expediting, is a discrimination and as such a violation of the Elkins act (U. S. Comp. St. §§8597-8599).

The case involved the shipment of high grade horses from Springfield, Illinois, to New York City. The carrier undertook to get the shipment to New York City for the usual compensation in time for the horses to be fitted for sale on a certain date. It failed to do so. The shipper claimed damages and brought action to recover, with the result above indicated.

By the act of February 19, 1903 (32 Stat. 647, chapter 708, §1 [1], [U. S. Comp. St. §8597]), amending the act of 1887, it is made "unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereto where any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereof, or whereby any other advantage is given or discrimination is practiced."

The decision in *Chicago and Alton Railroad Company* v. *Kirby, supra*, was followed by our Supreme Court of

Appeals in *Chesapeake and Ohio Railway Company* v. *Ruckman,* 115 Va. 493, 80 S. E. 496. Quoting from the syllabus, the court held:

"A special contract with a particular shipper, whereby a carrier agrees for the published rate to expedite an interstate shipment of freight and deliver the same on a designated day, gives to the particular shipper an advantage over other shippers and makes a discrimination in his favor which is prohibited by the interstate commerce act, and hence such a contract is void."

[1,2] The implied agreement of a common carrier is to carry safely and deliver at destination within a reasonable time. A railroad company may make a contract to deliver within a particular time, but to do so it must publish a rate open to all. To make a special contract otherwise is to extend an advantage to one not extended to all. For breach of such a contract relief will be denied. *Chicago and Alton R. Co.* v. *Kirby, supra.* The instant case comes directly within the influence of the above cases. No special rate has been shown to have been published for special contracts to delay shipments, and hence no shipments could legally be delayed.

If it is unlawful to contract to expedite a shipment, it is unlawful to contract to delay it, which as above stated was all that was done here. These cabbage were not diverted to another market, but the device adopted was one to delay their arrival in the market to which they were originally billed.

[3] The possibility of discrimination between shippers, to delay one shipper's goods and to forward another's, is as great in this case as it is in case of a special contract to expedite. It is clearly unlawful and custom could not make it lawful.

[4] We do not question a shipper's right to divert, or

recover such damages as result from a failure to divert, nor do we question that a failure to execute a *bona fide* order to divert would, in many cases, amount to conversion.   But it is apparent from the notice of motion itself that the so-called order to divert was nothing more than an order to delay completion of the transportation for two days in order to reach destination on a more favorable market.   That portion of the notice of motion which sets out the object of the delay order is as follows:

"But on the 14th day of May, 1921, we gave you orders, while said cars were in transportation, to divert both of same to same consignee, Jersey City, New Jersey, in ample time for you to accomplish such diversion, and you promised and agreed with us that you would divert both of said cars to the same consignee, at Jersey City, New Jersey, but, on the contrary thereof you wholly, negligently and carelessly failed and refused to divert such cars as you had promised and agreed with us to do, and carried them to their original destination where you unloaded both of said cars at pier 29, New York City, on Sunday night, May 15, 1921, and we were compelled to, and did, sell them on Monday morning, May 16, 1921.

"On Monday, May 16, 1921, the market for cabbage at New York City, owing to heavy receipts thereof, rapidly declined and said cabbage had to be, and was, sold after diligent efforts to obtain the best price possible therefor, at $2.25 per crate, whereas, if the diversion had been accomplished, these cars could have been held in Jersey City, New Jersey, as it was our purpose and intention to do, and for which reason we gave the diversion orders aforesaid, until Wednesday, the 18th day of May, 1921, when the market was $3.50 per crate in New York City, we could have sold the said cabbage and received that price for same."

The record shows that the consignees were Meyer and Company in the original bill of lading, that the consignees were not changed by the diversion order and that the goods were delivered to Meyer and Company, not in Jersey City, it is true, but in New York. These facts, which are not disputed, do not amount to a conversion. At most they could have been nothing more than a breach of contract. *McFadden* v. *Union Stock Yards & Transit Co.*, 185 Ill. App. 94.

But if we treat the order as a *bona fide* attempt to divert the shipment to Jersey City, and not as a subterfuge to hold the cabbage in the defendant's cars in Jersey City to be reshipped to New York to a more favorable market, and the failure of the railroad company to divert, as a conversion of the plaintiff's two cars of cabbage, still plaintiff is entitled to recover nothing.

[5, 6] It was the opinion of the trial court that the market price of cabbage on May 16, 1921, at Jersey City (which is governed by the market price at New York City) was the correct measure of defendant's liability in this case; the court held that the correct measure of damages for conversion by a common carrier is the market value of the property at the place of destination at the time converted, which, in the instant case, was the market value at New York on May 16, 1921; that the plaintiff had received this price for its cabbage, therefore had suffered no damages, which the law would sustain, by reason of the defendant's failure to divert these cars as it had agreed to do.

In this view the trial court was clearly right. It must be remembered that there was no loss of the property in the case under review and no misdelivery. The goods were delivered to the proper consignee, sold on account of the plaintiff, and duly accounted for. It must be further remembered that the markets in Jersey

City and New York are the same. Meyer and Company, the consignee, had control of the shipment upon delivery and they could have stored in New York for a better market as well as in Jersey City, since in either event they were not entitled to use the defendant's cars as warehouses. We, therefore, see no reason in a case of this kind for applying any other than the rule for measuring damages in case of conversion as enunciated in *Eastern Coal and Export Corp.* v. *N. & W. Ry. Co.*, 133 Va. 525, 113 S. E. 857, wherein the court held that the fair market value of the coal at the point of destination, less the cost of transportation and marketing there, was the true measure of damages. There are exceptions to this rule which are often applied, and ought to be. There are a number of such cases cited in plaintiff's petition for a writ of error, but rules there enunciated should have no application to a case such as we are now considering, in our judgment.

The fact that plaintiffs requested diversion of the shipment, in order to hold for a higher market, does not suggest the invocation of a different rule. Any contention that it does would seem to be disposed of by the holding in the case of *Keota Produce Co.* v. *C. R. I. & P. R. R. Co.*, 189 Iowa, 1284, 179 N. W. 834. This case is similar to the instant case, except that the eggs, the commodity shipped, were delivered at the wrong destination and to the wrong consignees. The shipment was originally made from Iowa to New York City. While the eggs were in transit, plaintiff requested that the car be diverted to Chicago. The initial bill of lading was taken up by the issuing carrier, a new bill of lading issued naming the plaintiff as consignee and Chicago as the destination. The diversion was not complied with.

The eggs arrived at New York City, and the com-

mission merchants to whom they were delivered and to whom they were initially consigned, sold them and remitted the net proceeds to the plaintiff. The amount received, however, on the sale in New York City was equal to what plaintiff would have received had the eggs been sold upon arrival at the Chicago market. The plaintiff there, as here, contended that it was desired to hold the eggs in Chicago for a better market.

The Iowa court followed the destination value rule, using the following language:

"The measure of damages for the conversion of goods is the same as though lost; that is, their market value at the place of destination named in the bill of lading, with interest, less the cost of transportation. Where delivered to the wrong person, and he subsequently pays the owner, this fact may be shown in mitigation. *Robinson* v. *Transportation Co.*, 45 Iowa, 470; *Jellett* v. *Railway Co.*, 30 Minn. 265, 15 N. W. 237; *Railroad Co.* v. *O'Donnell*, 49 Ohio St. 489, 32 N. E. 476, 21 L. R. A. 117, 34 Am. St. Rep. 579. And of course deduction of the amount actually received should be made." *Keota Produce Co.* v. *C., R. I. & P. R. R. Co.*, 189 Iowa, 1286, 179 N. W. 835.

And in disposing of the contention that the eggs were to be diverted with the intention of holding them in storage for a higher market, the court said:

"The court seems to have entertained the opinion that inasmuch as defendant 'had defeated the purpose and intention of the shipper and deprived him of a right which was within the contemplation of both parties, to wit, to store the eggs in Chicago for a reasonable time to see if the market would react, so that he could sell them for a profit,' plaintiff should be allowed as an element of damages the profit it would have realized had the eggs been delivered to the consignee in Chicago and stored five weeks and then sold on the market. The

defendant had notice that plaintiff intended to put the eggs in 'short held storage,' owing to prices being off in New York, but farther than this was not advised. See 3 Hutchinson on Carriers (3rd Ed.), 1621. No contract for such storage had been entered into, nor does there appear to have been any design as to the period of storage, and no contract of sale had been made. Surely it cannot be said, from the mere suggestion to defendant's agent of a purpose to put them in 'short held storage,' that the parties must have had in contemplation the storage of the eggs for any specified time, or until any specified price might be obtained, or that sale would be made at such price. If so, why not make the time of storage ten days or weeks, or six months even, as well as five weeks? Why select five weeks, save that the price of eggs was up at the particular time? All the carrier was advised of was the purpose of storage. Whether this would be continued a week, five weeks, or six months, was purely a matter of conjecture, as was also the price at which ultimate sale might be made. See *Howard* v. *Brown*, 168 Iowa, 410, 148 N. W. 987; *Morgan & Wright* v. *Sutlive Bros.*, 148 Iowa, 318, 126 N. W. 175. As viewed from the date of the breach of contract to carry, the element of profits was entirely speculative and uncertain, and for this reason there can be no recovery, as only prospective profits are claimed, even though it subsequently developed that had the shipper pursued a particular course, and he might have pursued several others, there would have been a profit.''

Judgment should have been entered for defendant.

For the foregoing reasons we are of opinion that the trial court was plainly right in setting aside the verdict of the jury and in entering up judgment for the plaintiff, and that such judgment should be affirmed.

*Affirmed.*