CHARLES A. SIEBERT, Appellant, v. ERIE RAILROAD COMPANY, Respondent.

First Department, December 5, 1919.

Carriers — validity and effect of unfiled Canadian bill of lading under which silver ore was shipped from Canada to United States — liability of connecting carrier for theft of silver nuggets from car which had been left on siding en route at a point in the United States for the accommodation of the shipper and subsequently accepted by the carrier after said nuggets had been separated from the ore — application of provisions of uniform bill of lading relieving carrier from liability — delivery by and redelivery to carrier en route under through bill of lading.

In an action to recover for the loss of freight which was shipped from a point in Canada on a Canadian bill of lading to a point in the United States, the provisions of the Canadian bill of lading with respect to classification and rates in so far as they purport to limit the liability of the carrier are void if the classification and rates have not been filed with and approved by the Canadian Board of Railway Commissioners and filed with our Interstate Commerce Commission.

The provisions of a Canadian bill of lading on a shipment of freight from Canada to a point in the United States are inoperative after the shipment passes the international line and from that point the uniform classification prescribed by our Interstate Commerce Commission and the tariff filed by the connecting carrier thereunder attach and govern the liability of the connecting carrier for any loss of freight occurring thereafter.

The plaintiff's assignor shipped a carload of silver ore from Cobalt, Canada, on a through bill of lading consigned to the American Smelting and Refining Company at Perth Amboy, N. J. There was in the body of the shipping order and of the bill of lading a typewritten notation as follows: " To be stopped off at Bergen Jct. for sampling at Ledoux & Co. works." The car was received by defendant at Suspension Bridge, Niagara Falls, N. Y., and arrived over its railroad at Bergen Junction and was left by the defendant opposite a freight platform of Ledoux & Co.'s sampling works. It was there sampled and in the process of doing so the ore was crushed and silver metallics or nuggets averaging about eighty per cent silver were screened out, but the process involved no smelting or refining and the original condition of the ore was not otherwise changed. The car was reloaded and the silver nuggets were placed in separate bags. After the defendant's agent inspected and sealed the car and signed a receipt therefor, including the silver nuggets, the car was broken open and the nuggets stolen therefrom. Under the circumstances the car and the ore were in the possession of the defendant, as a common carrier, at the time of the theft.

The provisions of the uniform bill of lading approved by and filed with the Interstate Commerce Commission govern the shipment although the defendant did not issue or deliver to the shipper any bill of lading.

The uniform bill of lading has no application to an intrastate shipment.

Sections 5 and 6 of the uniform bill of lading relieve a carrier from liability for the theft of freight from a car while standing on a siding awaiting shipment at the initial point or awaiting delivery at the point of destination.

As the shipment of ore was made on a through bill of lading there could not be a lawful delivery by and redelivery to the carrier *en route.*

Therefore, the defendant was not entitled to the benefit of said sections of the uniform bill of lading as to the car which was temporarily left on a siding of the carrier *en route* solely for the accommodation of the shipper, for such special accommodation to the shipper was not provided for or authorized by the uniform bill of lading and it was, therefore, unlawful and not binding on the carrier.

Even though in this case the carrier may have been relieved of liability while the ore was in the possession of the person to whom it was delivered for sampling, it resumed possession as a carrier when its representative sealed the car into which the ore had been reloaded and delivered a receipt therefor to the sampler.

Since the shipper did not sign the release clause indorsed on the bill of lading, he was not entitled to the reduced rate applicable thereto, and the liability of the defendant is not affected by its failure to exact the same

rate from the initial point of shipping as was exacted for its benefit by the final carrier from Bergen Junction, the point where the loss occurred, to Perth Amboy.

The separation of the silver nuggets from the ore and placing them in the car did not constitute a fraud on the defendant releasing it from liability for the loss of said nuggets, for the defendant consented to the removal of the ore from the car for the purpose of sampling and the evidence shows that it was well informed of the process of sampling and knew that in that process the nuggets would be separated from the ore.

Moreover, the carrier cannot defend on this ground inasmuch as the separation of the ore was made pursuant to a special privilege accorded the shipper in violation of law.

And furthermore the carrier is bound by the knowledge acquired by its agent when he receipted for the ore by a receipt reciting with substantial accuracy the contents of the car which receipt showed the presence of the silver nuggets in the car in separate bags.

The defendant is not relieved from liability for the theft of the nuggets on the ground that they were of extraordinary value and were not specifically rated in the published classification or tariff and that there was no special agreement that the defendant should be liable therefor or stipulated value of the articles indorsed on the bill of lading as provided in section 6 of the uniform bill of lading, for if, by the changes made in sampling the ore, part of it came within section 6 of the uniform bill of lading it was the direct result of the defendant's violation of the statute and presumably was contemplated and it cannot be heard to complain.

And furthermore, the evidence did not show that the said nuggets, even though they had been shipped as such from the initial point of shipment, would have constituted articles of extraordinary value within the provisions of section 6 aforesaid.

APPEAL by the plaintiff, Charles A. Siebert, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 9th day of April, 1915, upon a dismissal of the complaint by direction of the court at the close of the case after a trial by a jury at the New York Trial Term, and also from an order entered in said clerk's office on the same day, denying plaintiff's motion for a new trial made upon the minutes.

*Arthur W. Clement* of counsel [*Wilson E. Tipple* with him on the brief; *Tipple & Plitt,* attorneys], for the appellant.

*Harold W. Bissell* of counsel [*William C. Cannon* with him on the brief; *Stetson, Jennings & Russell,* attorneys], for the respondent.

LAUGHLIN, J.:

This is an action on the assigned claim of a shipper against the defendant as a common carrier for the loss of certain freight. The freight constituted part of a carload of silver ore which the plaintiff's assignor, the Crown Reserve Mining Company, Ltd., delivered to the Temiskaming and Northern Ontario Railway, at Cobalt, Canada, on the 27th of November, 1908, to be shipped on a through bill of lading consigned to the American Smelting and Refining Company at Perth Amboy, N. J. In the shipping order given by the consignor, evidently on a blank furnished by the carrier, and in the bill of lading issued by the initial carrier, the freight is described as " 550 bags silver ore," said to weigh about 60,000 pounds. In the body of the shipping order and of the bill of lading there was a notation in typewriting as follows: " To be stopped off at Bergen Jct. for sampling at Ledoux & Co. works," and a notation indicating that the shipment was to be made via the Grand Trunk and Erie railroads. It does not appear by the shipping order or the bill of lading that the shipper specified the value of the freight; but the printed provisions of both the shipping order and the bill of lading show that the shipment was to be made subject, among other things, " to the terms and conditions of the current classification of freight and tariff," all of which was agreed to by the shipper as the basis upon which the carrier's receipt was to be given for the property " and as a special contract in respect thereof." It is to be inferred from these provisions that the initial carrier had an official classification of freight and tariff by which, on a limitation of the common-law liability of the carrier, freight was transported at a lower rate, and that this shipment was, therefore, intended to be made under such classification instead of on an unrestricted liability for which a higher rate would be charged. It is, however, conceded by both parties that the provisions of the Canadian bill of lading with respect to classification and rates and in so far as they purport to limit the liability of the carrier are void for the reason that the classification and rate were not filed with and approved by the Canadian Board of Railway Commissioners and filed with our Interstate Commerce Commission, and that in any event they were

inoperative after the shipment passed the Canadian line and came into the United States, and that thereupon the uniform classification prescribed by our Interstate Commerce Commission, and the tariff filed by the defendant thereunder attached, and that they govern and control the decision of the issues in this action.

The car containing the freight was transported by the initial carrier to North Bay, Canada, and there delivered to the Grand Trunk railway and by it delivered to the defendant at Suspension Bridge, Niagara Falls, N. Y. Pursuant to the notation on the bill of lading the defendant placed the car on one of its sidings at Bergen Junction, opposite a freight platform of Ledoux & Co.'s sampling works. Ledoux & Co. unloaded all of the ore and ran it through a crushing machine, evidently for the purpose of obtaining more uniform samples. When received by the initial carrier the ore consisted of silver and the " binder " of rock and other substance in which it was contained and was of the average value of $3,000 per ton. The crushing and the screening separated part of the silver from the " binder." The part so separated is known as silver metallics or nuggets and averaged about eighty per cent silver, the remaining twenty per cent being other mineral. The process, however, involved no smelting or refining and the original condition of the ore was not otherwise changed. The change thus made merely altered the size of the lumps of the ore and resulted in part of the separated lumps of ore containing a much higher percentage of silver and the remainder a lower percentage than the average of the ore as originally delivered to the carrier. Ledoux & Co. then took a sample of the eighty per cent and of the remaining ore and replaced all of the ore, excepting the samples, in the bags from which it had been taken and reloaded it into the car; but that containing the higher percentage known as nuggets was kept separate and filled five bags. This was about eight days after Ledoux & Co. took possession of the ore, and thereupon they notified the representative of the agent of the defendant that the car was ready to go forward, whereupon he came to the car, looked it over, counted the bags, sealed the car, and signed a receipt presented by Ledoux & Co. therefor, specifying that the defend-

ant had received 241 bags of certain markings and 275 bags marked "R3 Ag. ore" and "5 bags Ag. nuggets." It was discovered the next day, before the car had been attached to a train or moved, that the seal had been broken, and on examination by the defendant's representative it was found that the five bags specified as "Ag. nuggets" had been taken therefrom. The car was then resealed. and forwarded to destination. The five bags of ore stolen from the car weighed 398 pounds and were of the value of $1,595.94, or at the rate of about $8,000 per ton, and this action was brought to recover that amount.

There can be no doubt but that the car and the ore were in the possession of the defendant, as a common carrier, at the time of the theft.

The defense which was sustained by the learned trial court was based upon the provisions of the uniform bill of lading approved by and filed with the Interstate Commerce Commission which relates only to interstate shipments; and it is conceded that the provisions thereof govern, although the defendant did not issue or deliver to the shipper any bill of lading. Both parties claim that this was a single contract for an interstate shipment and not two contracts; one for a shipment from Cobalt to Bergen Junction, and the other, from the latter point to Perth Amboy. It was regarded by the defendant as a single through contract. If there were two contracts of shipment the defense would necessarily fail, for concededly the uniform bill of lading on which it is predicated has no application to an *intrastate* shipment, which a shipment from Bergen Junction to Perth Amboy would be. The uniform bill of lading, which concededly attached to the shipment when the freight was delivered to the defendant, although, as already stated, it delivered no bill of lading therefor, contains provisions printed on the back thereof and made a part of the contract of shipment, among others, as follows:

"Sec. 5. * * * Property destined to or taken from a station, wharf, or landing at which there is no regularly appointed agent shall be entirely at risk of owner after unloaded from cars or vessels or until loaded into cars or vessels, and when received from or delivered on private or

other sidings, wharves, or landings shall be at owner's risk until the cars are attached to and after they are detached from trains.

" Sec. 6. No carrier will carry or be liable in any way for any documents, specie, or for any articles of extraordinary value not specifically rated in the published classification or tariffs, unless a special agreement to do so and a stipulated value of the articles are indorsed hereon."

The complaint was dismissed on the theory that these provisions were applicable to the car while on the siding and before it was attached to a train for the resumption of the transportation from Bergen Junction to Perth Amboy. These provisions would, doubtless, have relieved the defendant from liability for the theft if it had occurred while the car was on siding awaiting shipment at the initial point or awaiting delivery at the point of destination. (See *Bers* v. *Erie R. R. Co.*, 225 N. Y. 543, affg. 176 App. Div. 241; *Standard Combed Thread Co.* v. *Penna. R. R. Co.*, 88 N. J. L. 257.) This being a through bill of lading there could not be a lawful delivery by and redelivery to the carrier *en route.* Of course the shipper would be estopped from denying delivery in so far as the ore was received and retained by its agent, Ledoux & Co., but that is not the point here presented.

We are of the opinion, therefore, that the defendant is not entitled to have those provisions applied to a car temporarily left on a siding *en route* solely for the accommodation of the shipper, for such special accommodation to the shipper was not provided for or authorized by the uniform bill of lading and it was, therefore, unlawful. (Elkins Act, § 1, being 32 U. S. Stat. at Large, 847, chap. 708, § 1, as amd. by 34 id. 587, § 2; Interstate Commerce Act, §§ 3, 6, being 24 U. S. Stat. at Large, 380, § 3; Id. § 6, as amd. by 34 id. 586, § 2.) Other shippers paying the same rate for transportation were not entitled, under the uniform bill of lading and filed tariffs of the defendant, to such accommodation, and, therefore, the agreement to extend to this shipper the privilege of having the ore thus temporarily delivered *en route* came within the express provisions of the Federal statutes cited, and was not binding on the carrier. (*D' Utassy* v. *Southern Pacific Co.*, 174 App. Div. 547; affd., 225 N. Y. 694; *Chicago &*

*Alton R. R. Co.* v. *Kirby,* 225 U. S. 155; *Kansas Southern Railway* v. *Carl,* 227 id. 639, 653; *Delaware, L. & W. Railroad* v. *United States,* 231 id. 363; *Missouri Pacific Railway* v. *McFadden,* 154 id. 155; *Robinson* v. *N. Y. & Texas Steamship Co.,* 63 App. Div. 211; 75 id. 431; affd., on both opinions, 177 N. Y. 565; *London & Lancashire Fire Ins. Co.* v. *R., W. & O. R. R. Co.,* 144 id. 200.) The *D' Utassy* case was not decided until after the trial and decision of the issues herein and consequently the learned trial court did not have the benefit of the views therein expressed which we think lead logically to the conclusion that the carrier in the case at bar, if relieved of liability while the ore was in the possession of Ledoux & Co., resumed possession *as a carrier* when its representative sealed the car into which the ore had been reloaded and delivered a receipt therefor to Ledoux & Co., and is, therefore, liable for the loss of the ore.

A higher rate was exacted and collected by the final carrier — the Lehigh Valley Railroad Company — for the transportation from Bergen Junction to Perth Amboy than was charged and collected by it from Cobalt to Bergen Junction and the defendant received and retained its proportionate share of the freight charged which was on *all the ore* delivered to the initial carrier. That evidently was done on the theory that the shipper for that part of the transportation from Cobalt to Bergen Junction was not bound by a release clause on the Canadian shipping order and the Canadian bill of lading limiting the liability of the carrier to $100 per net ton, for which a lower rate would have been charged. The printed release clause on the shipping order and bill of lading contained a blank for the signature of the shipper that was not signed in either case. The learned counsel for the defendant contends that the higher rate from Bergen Junction was exacted through a mistake and that the release clauses were binding notwithstanding the fact they were not signed by the shipper, and that, therefore, the defendant's liability, in any event, was limited to $100 per ton. We are of the opinion that the shipper not having signed the release clause was not entitled to the reduced rate applicable thereto and that the liability of the defendant is not affected by its failure

to exact the same rate from the initial point of shipping as was exacted for its benefit from Bergen Junction. The joint freight tariffs of the carriers participating with the initial carrier, including the defendant, contained similar requirements with respect to the shipper's releasing liability by signing a clause to that effect and the freight tariff of the defendant also required a signed release clause. It is further contended on behalf of the defendant that separating the silver metallics or nuggets from the other ore and placing them in the car constituted a fraud on the defendant and released it from liability for the loss thereof. There is, we think, no merit in that contention for the reason that there was but a single contract of shipment. The defendant consented, without having been bound so to do, to the removal of the ore from the car for the purpose of sampling, and the sampling was done in the ordinary manner which, although it separated the ore to some extent, did not change the shipment, for the car when redelivered to the defendant and accepted by it contained precisely the same ore that was in it originally with the exception of the amount taken therefrom for sampling. I am of the opinion that the defendant is chargeable with knowledge of the process of sampling intended. It permitted the removal of all the ore from the car, and left the car there to be reloaded when the process of sampling was finished. Moreover it is fairly to be inferred that it was obtaining considerable similar freight for transportation under like conditions, for the premises on which Ledoux & Co.'s works were erected were owned by the defendant and by it leased to Ledoux & Co. on the 26th of July, 1905, and by the terms of the lease it was contemplated that freight shipped on through bills of lading would be temporarily delivered to and unloaded by Ledoux & Co. for sampling, among other things, and reloaded by Ledoux & Co. and then shipped to destination by the defendant and that during such process Ledoux & Co. should, as between the parties, assume defendant's liability as a common carrier until the freight was redelivered to the defendant. The defendant knew that the car originally contained 550 bags of ore and that after the sampling there were only 521, showing a shortage of 29 bags. In the circumstances, therefore, the defendant is

chargeable with knowledge of the process and effect of the sampling and it is quite immaterial whether or not its local agent who then receipted for the ore was familiar therewith. It is immaterial whether the defendant knew the method of sampling since it thus contracted broadly to permit sampling. The single through shipping contract was not induced by fraud. The ore when delivered to the initial carrier concededly was exactly as represented. No misrepresentation was made to the carrier at Bergen Junction and no new contract of shipment was negotiated there. Moreover the carrier should not be permitted to defend on this ground inasmuch as the separation of the ore was made pursuant to a special privilege accorded the shipper in violation of law. Furthermore, the carrier is bound by the knowledge acquired by its agent, when he receipted for the ore by a receipt reciting with substantial accuracy the contents of the car and of the bags and, therefore, there was no fraudulent concealment with respect to the changed condition of the ore.

The defendant also contends that it is relieved from liability on the ground that these nuggets or metallics were of extraordinary value and were not specifically rated in the published classification or tariff and that there was no special agreement that it should be liable therefor or stipulated value of the articles indorsed on the bill of lading as provided in section 6 of the uniform bill of lading. What has already been said is, I think, a sufficient answer to this contention, for it is conceded that the ore when originally shipped came within the defendant's classification of silver ore, and if, by the changes therein made by Ledoux & Co. in sampling, part of it ceased, as claimed by the defendant, to fall within that classification, that was the result of the defendant's violation of the statute and presumably was contemplated and it cannot be heard to complain. If, however, the point as to whether a part of this ore by the sampling *en route* became of extraordinary value were material, it has not been satisfactorily shown that it became of extraordinary value within the contemplation of the published classification or uniform bill of lading or that a higher rate of freight than the rate applicable to unreleased freight would have attached thereto. The Cobalt silver ore ranged in value from $100 to $5,000 per

ton. The nuggets or metallics in the five bags were of a value of about $7,979.70 per ton. As already observed by the evidence, it has not been shown that the nuggets or metallics, if they had been in the condition when shipped from Cobalt that they were in when shipped from Bergen Junction, would have constituted articles of extraordinary value within the provisions of section 6 of the uniform bill of lading or that a different rate of freight charges would have been applicable thereto; but if it had been, the separation of the ore by Ledoux & Co. in the process of sampling was under an agreement of the carrier with the shipper made in violation of the statute and contemplated by the parties, and, therefore, the defendant cannot be heard to complain thereof.

The trial was before the court and a jury, but at the close of the evidence counsel for the plaintiff moved for a direction of a verdict and counsel for the defendant moved for a dismissal of the complaint. The court reserved decision on the motions, and it was thereupon stipulated that the court might give judgment without the presence of the jury with the same force and effect as if the jury were present. It follows that the court erred in denying plaintiff's motion for a direction of a verdict and granting the defendant's motion for a dismissal of the complaint. The judgment and order should, therefore, be reversed, with costs to appellant, and judgment entered in favor of the plaintiff for the sum of $1,595.94, the value, according to the uncontroverted evidence, of the freight which was lost, together with interest thereon from the 23d day of December, 1908, with costs.

CLARKE, P. J., DOWLING, SMITH and MERRELL, JJ., concurred.

Judgment and order reversed, with costs to the appellant, and judgment ordered in favor of the plaintiff for the sum of $1,595.94, together with interest thereon from the 23d day of December, 1908, with costs. Order to be settled on notice.