**UNITED STATES of America,**
**Plaintiff,**

v.

**UNION PACIFIC RAILROAD COM-**
**PANY, Defendant.**

**Civ. A. No. 1–299.**

United States District Court
S. D. Iowa, W. D.
April 3, 1959.

Roy L. Stephenson, U. S. Atty., Des Moines, Iowa, John C. Stevens, Asst. U. S. Atty., Muscatine, Iowa, Daniel M. O'Donoghue, Washington, D. C., for plaintiff.

Walter R. Rouse, Elmer B. Collins, James H. Anderson, Omaha, Neb., Addi-

son C. Kistle, Council Bluffs, Iowa, for defendant.

HICKLIN, District Judge.

This cause has been submitted on motions for summary judgment filed by each of the parties, and the Court, after having considered the complaint, the answer and amendment thereto, the affidavits attached to each motion for summary judgment, certified public documents, memoranda of law submitted by both parties, and after hearing arguments of counsel, finds the facts specifically which constitute the grounds of the action of the Court upon said motions as follows:

### Findings of Fact

1.

That this action is being prosecuted by the United States of America by its attorney for the Southern District of Iowa, Western Division, under the direction of the Attorney General of the United States, at the request of the Interstate Commerce Commission of the United States made by authority of the Act of Congress entitled "An Act to further regulate commerce with foreign nations and among the States", known as the "Elkins Act", as amended (49 U.S.C. §§ 41–43). That the complaint charges that the defendant has violated Section 6(7) of the Act of Congress entitled "An act to regulate commerce", as amended (49 U.S.C. § 6(7) and Section 1 of the "Elkins Act" (49 U.S.C. § 41) by extending to transit lumber shippers and wholesalers privileges and facilities in the transportation of property which are not specified in the tariffs, and by granting and giving concessions advantages and discriminations prohibited by said Acts, and said complaint prays that said alleged violations of law be permanently enjoined.

2.

That the defendant was served with process.

3.

That defendant Union Pacific Railroad Company is and at all times in question was a corporation and a common carrier engaged in interstate and foreign commerce, for compensation, and was engaged in the transportation of property for the public between points and places in the Western states of the United States and Council Bluffs, Iowa, within the Southern District of Iowa.

4.

That for a long period of time, and particularly since September 21, 1949, up to the date of the filing of the complaint, defendant, a common carrier by railroad is and has been engaged in the interstate transportation of property, including lumber, under the tariffs and concurrences in tariffs, duly filed by defendant with the Interstate Commerce Commission, which tariffs prescribed regular charges, rules, and regulations for the interstate shipment of property.

5.

In order to produce the vast quantity of lumber required during World War II, numerous small lumber mills commenced operation in the Northwest area of the United States, mainly in northern California, Oregon and Washington. These mills did not have any established commercial market, as their production was primarily for war requirements. To remain in business when the war demand ended, it was necessary for these small mills to develop a method of merchandising adaptable to their operations, and the so-called "roller" method of lumber marketing resulted. In this type of marketing, a negotiable instrument covering the shipment is turned over to wholesalers or brokers who endeavor to locate a purchaser while the shipment is moving eastward. When a sale is consummated the transfer to the buyer is accomplished through diversion or reconsignment instructions to the railroad while the shipment is enroute. Most of this lumber moves to markets east of the Missouri and Mississippi Rivers over lines and routes of several railroads which directly serve the Northwest area and which, with connecting lines, form

numerous through routes to the various markets.

**6.**

That the defendant, Union Pacific Railroad, has the shortest physical route to said markets, and therefore is able to deliver the lumber under normal conditions in the shortest time.

**7.**

That the other railroads competing with defendant for said lumber business have longer physical routes in varying degrees, and that therefore the delivery of the lumber under normal conditions takes a longer time in direct proportion to the number of miles the shipment must travel to reach its destination. For example, a shipment of lumber from Portland, Oregon, to Chicago, Illinois by Union Pacific to Council Bluffs, Iowa, and then by Chicago, Milwaukee, St. Paul and Pacific Railroad, (Union Pacific direct route) would travel a distance of 2,259 miles. The same shipment, if originated by Southern Pacific Railroad would travel 2,584 miles, or 325 miles more. If the same shipment was originated by Southern Pacific Railroad and then routed through Tucumcari, New Mexico, and from there to Chicago by Chicago, Rock Island and Pacific Railroad, it would travel a distance of 3,349 miles, or 1,090 miles more than by direct Union Pacific route.

**8.**

That the cost of a shipment of lumber from the Northwest area of the United States to a competitive market such as Chicago, Illinois, or Council Bluffs, Iowa, is exactly the same to the shipper under published and approved tariff rates, and that this is so whether the lumber is shipped in a direct route or by a long circuitous route.

**9.**

That the distance from Ogden, Utah, to Council Bluffs, Iowa is 903 miles on the Union Pacific Railroad through route, and the running time of a freight train for said distance under normal conditions is from two to four days.

Stated another way, a freight train will travel on the average about 300 miles per day.

**10.**

That following World War II, lumber shippers increasingly shipped by the longer circuitous routes in order to gain additional time in which to find a market for the lumber which was in transit. That in order to meet the competition of the longer and more time-consuming routes, and in order to attract certain lumber traffic to its lines, the defendant offered to transit wholesalers of lumber a special delayed service whereby the defendant carrier intentionally delayed shipments of lumber in transit on its lines in order that the lumber wholesaler might have additional time to find a market for such lumber. As a further part of this special service, when the transit wholesaler, by means of a diversion order requested prompt delivery of the shipment because he had made a sale thereof, the defendant carrier would remove a "transit car of lumber" from the delayed service and move it forward in defendant's regular service toward destination.

**11.**

That beginning September 21, 1949, defendant established "SMX" schedules for the movement of freight. "SMX" is an abbreviation meaning "slow manifest service". Said "SMX" service was a delayed service wherein the delay was effected by setting loaded cars out on various sidings along the main line, where the cars could be restored to normal service whenever the shipper found a sale.

**12.**

That said "SMX" service applied to the movement of both perishable and dead freight, including lumber, and all other traffic of any shipper requiring slower than normal service.

**13.**

That the schedule in "SMX" service between Ogden, Utah, and Council Bluffs, Iowa, was nine days, as compared to normal time of two to four days.

**14.**

That because of an acute car shortage then prevailing and in an effort to assist in obtaining greater utilization of the car supply then available, defendant voluntarily suspended its "SMX" schedules effective July 31, 1950.

**15.**

That during the ensuing fourteen months lumber shippers increasingly routed their traffic via the longer and slower routes, and defendant on October 2, 1951, in an effort to regain such traffic, modified its procedure by handling such traffic over a parallel line of its railroad via Ellis, Kansas, which is 317 miles out of the direct line haul between Ogden, Utah, and Council Bluffs, Iowa. That under said modified procedure, the transit lumber shipper seeking delayed service had only to place the code words "route via Ellis" on the bill of lading and shipping order. That such circuitous routing required two additional days over normal schedule when interchanged to connecting carriers at Kansas City, Missouri, or three additional days over normal schedule when interchanged to connecting carriers at Council Bluffs, Iowa.

**16.**

That because train operations over defendant's main line are more economical than over the longer route via Ellis, Kansas, the actual physical handling of traffic via Ellis was discontinued on December 12, 1953, and a so-called "lumber special" service was inaugurated for main-line operation in which the shipment proceeded on the main line, but on a schedule comparable to that which had been obtained during the physical movement via Ellis. That a shipper desiring such slow service continued to use the code words "route via Ellis", even though the shipment did not travel by that route.

**17.**

That thereafter, on January 6, 1954, defendant changed its so-called "lumber special" schedule to twelve days, and again, on February 15, 1954, changed said schedule to fourteen days.

**18.**

That the last-mentioned method of delaying shipments continued until about June 13, 1956, at which time defendant suspended its delayed service due to the issuance of the Interstate Commerce Commission's Service Order No. 910 prohibiting the intentional delay of freight shipments while in transit.

**19.**

That on December 7, 1956, when the temporary Service Order No. 910 was vacated, defendant reinstated its delayed service on a fourteen-day schedule between Ogden, Utah, and Council Bluffs, Iowa, and changed the code words indicating that slow service was desired to "via Colby", and accomplished the delay by setting the lumber cars out on sidings along its direct route between the point of origin and point of destination.

**20.**

That defendant, by giving delayed lumber service, allows certain lumber shippers a special slow service not provided for by tariff.

**21.**

That by its delayed lumber service defendant carrier contributes the use of its trackage and cars to provide a storage facility for transit lumber shippers and wholesalers, thus assuming certain warehousing and inventory maintenance costs of a segment of the lumber industry at no expense to the lumber dealer.

**22.**

That the defendant's contribution of trackage and cars to the lumber dealers' operating costs results in a loss of transportation facilities to the shipping public in the form of freight car shortages.

**23.**

That the defendant's unnecessary setting out of freight cars on sidings results in added carrier operational problems and costs occasioned by the additional need for power and working crews.

**24.**

That the defendant's delaying service entails the payment of excessive per diem cost for the use of foreign cars on defendant's line with the resulting tendency to unbalance the defendant's annual per diem offsets with other railroads to the economic disfavor of defendant and to the detriment of the national policy to maintain economically stable transportation facilities. This factor is highlighted by the per diem payments of approximately $53,760 incurred by the defendant on 19 lumber trains accorded its slow service during a portion of the month of July, 1954.

**25.**

That the defendant's delaying service for lumber as set forth above constitutes a device whereby certain transit lumber dealers avoid the payment of demurrage and obtain certain other advantages such as having their lumber on wheels ready for diversion to any potential market, such advantages place these dealers in a superior competitive position in the marketing of lumber.

**26.**

That the principal and compelling motive of the defendant Union Pacific throughout all phases of its activities in connection with its slow lumber practices was to secure additional lumber traffic for its line of railroad and to divert such traffic from competing railroads.

**27.**

That the defendant, at the time of the institution of this action, was continuing the operation of its delayed lumber service as set forth above, and is likely to continue such practices if it is not restrained.

**28.**

That defendant, in conjunction with other railroad common carriers, has filed and published at all times mentioned herein, and now publishes with the Interstate Commerce Commission, tariffs of rates and charges, rules and regulations governing the line haul transportation service and accessorial services, including diversion, reconsignment, and demurrage, applicable to lumber and other commodities in carload lots transported from points in Oregon, Washington and other Western states, but does not include any extra charge for an intentionally delayed shipment.

**29.**

That said tariffs do not specify or provide for or offer the performance of slowed or delayed transportation service, or any schedule or "running time" for performance of any transportation service, or the transportation of lumber or any other property by any particular train, or in time for any particular market; and that said tariffs do not publish or provide for any greater or lesser or additional or any different freight charges for transporting one shipment faster or slower than another shipment.

**30.**

That defendant has made and does make available the performance of the slower freight service for all shippers desiring such service, and has not selected nor acted secretly with any particular shippers in offering and performing such slower service. That nevertheless, the main users of such delayed service are certain lumber shippers.

**31.**

That after this cause was instituted, several railroads, not including the defendant herein, filed tariffs with the Interstate Commerce Commission, offering to perform without extra charge a fifteen-day delay in the movement of cars of lumber, or articles taking lumber rates, by holding the cars at a "hold point" without demurrage charges. That by order dated October 27, 1958, the Interstate Commerce Commission, in Investigation and Suspension Docket No. 7050, *Lumber—Free Time Allowance at Hold Points*, suspended said tariffs filed by said railroads and instituted its own investigation "into and concerning the lawfulness of the regulations contained in said schedules, with a view to making such findings and orders in the premise

as the facts and circumstances shall warrant." This Court has been informed that a hearing on said matters is now in progress at Portland, Oregon.

### 32.

That the advantages of a delayed service schedule to certain groups are well stated in a statement contained in a letter obtained from defendant's own files and written by one of defendant's officers on May 1, 1952. It states in part as follows:

"*Eugene* March was a rather cold month and quite a little snow fell in the foothills and higher elevations. This slowed production and orders were difficult to place. Even the smallest Western Wholesalers now feels that the only way to continue business is to get lined up to sell some 'rollers'. With the large mills only able to take on so much, and the small mill shipping almost entirely for the large transit wholesalers, it almost forces him to do some of this type of business.

" 'Rollers' moved in considerable volume during February and March. The small mill is well satisfied with this method of marketing his production. He does not have to maintain an order file of any consequence, nor does he have to carry an inventory from which to fill specified orders. He runs his logs through the mill, loads up a car with a favorable mixture, calls the tally to his wholesale outlet and sends them his bill of lading. He can either sell the wholesaler the car outright or give it to him on a consignment basis, but in either event the wholesaler will send him up to 80% of the value of the lumber within a few days after shipment. He is always on the current market and in most cases his lumber is bringing him a premium price, either because the transit operators are bidding against each other for his lumber or because the buyer is willing to pay more for lumber rolling and only a few days from being at destination, which eliminates the necessity of consumers maintaining large inventories. The rolling railroad car is the warehouse. The wholesalers, commission men and consumers in the receiving area receive many lists of rollers and from them they are nearly always able to pick up cars almost exactly covering their requirements, and only a few days away. This beats placing firm orders which at best are usually accepted on 30-days shipment, and on a rising market often just don't get shipped. About all they submit inquiries on any more are highly specified stocks which are not found in sufficient quantities in roller cars and which they must place on a firm order basis in order to fill in their low spots. These inquiries are the ones being received by the Western Wholesaler who is doing only a firm order business, and quite naturally he finds it almost impossible to get them placed."

### 33.

That there is no genuine issue as to any material fact in this cause.

Before making specific conclusions of law, this Court is of the opinion that a discussion of the facts, the law and the respective claims of the parties would be helpful.

Section 6(7) of the Interstate Commerce Act, 49 U.S.C.A. § 6(7), provides as follows:

"No carrier, unless otherwise provided by this part, shall engage or participate in the transportation of passengers or property, as defined in this part, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this part; *nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers of property, or for any service*

*in connection therewith,* between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor *extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs."* (Emphasis supplied.)

Section 1 of the Elkins Act (49 U.S. C.A. § 41) provides in pertinent part as follows:

" * * * *it shall be unlawful for any* person, persons or *corporation to offer, grant, or give,* or to solicit, accept, or receive *any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce* by any common carrier subject to said act to regulate commerce and the Acts amendatory thereof *whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier,* as is required by said act to regulate commerce and the Acts amendatory thereof, *or whereby any other advantage is given or discrimination is practiced.* * * * "* (Emphasis supplied.)

The Government in its complaint alleges that the delayed lumber service offered and given by the defendant without charge constitutes the extension to "roller" lumber shippers and wholesalers of privileges and facilities in the transportation of property which are not specified in the published tariffs, in violation of Section 6(7) of the Interstate Commerce Act above quoted.

The Government also alleges that such delayed lumber service constitutes the granting and giving of concessions and discriminations whereby lumber is transported in interstate commerce at less than published tariff rates, and whereby

advantages and discriminations are practiced in favor of the transit lumber shipper or wholesaler, in violation of Section 1 of the Elkins Act above quoted.

On the other hand, the defendant contends that there are no provisions of the Interstate Commerce Act, and no rules or regulations of the Interstate Commerce Commission, requiring that railroad carriers publish in tariff form a schedule showing the length of time required for shipments of lumber. Defendant maintains that it delays lumber shipments en route only to meet the competition of the longer, more circuitous routes of other competing carriers.

Defendant further maintains that the entire matter here under consideration is under the exclusive jurisdiction of the Interstate Commerce Commission in that it is an administrative problem to be determined by the commission.

Section 6(1) of the Interstate Commerce Act (49 U.S.C.A. § 6(1) requires all common carriers to file with the commission and keep open for public inspection schedules showing all the "rates, fares, and charges for transportation between different points on its own route" and points on other routes when a joint rate has been established. It further provides that said schedules "shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed, and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee".

In its argument, defendant states that it is clear from the basic allegations of the complaint and the suspension order of October 27, 1958, that the Commission's own investigation "covers the dominant facts alleged in the present case as constituting a violation" of the Interstate Commerce Act and the Elkins Act. Defendant goes on to state that

the real basic and fundamental questions in both the case at bar and in the Commission's investigation which is now in progress are:

(1) Whether the published tariff rates admittedly collected and retained by the defendant are "just and reasonable" for both the fast and the slow service performed by the defendant, and that is a question of fact for the Commission's determination under Section 1(5) of the Interstate Commerce Act; (2) whether defendant's performance of both services at the same published rates and charges is just and reasonable "practice", and that is a question of fact for the Commission's decision under Sections 1(6) and 15(1) of said Act; (3) whether, in performing both fast service and slow service for all shippers alike at their request, for the same published tariff rates and charges, defendant may be deemed guilty of "unjust discrimination", and that is a question of fact for the Commission's decision under Section 2 of said Act; (4) whether performance of both fast and slow service for all shippers alike for the same published tariff and charges causes an "undue or unreasonable preference or advantage" or any "undue or unreasonable prejudice or disadvantage", and that is a question of fact for the Commission's decision under Section 3 of said Act; and (5) whether the slow service at published rates for all shippers alike, but without description of the service in the published tariffs, in fact, constitutes "privileges" not specified in the tariffs within the prohibition of Section 6(7) of said Act, and that is a question of fact for the Commission's decision under Section 6 (1) of said Act, which requires railroads to publish "all other charges which the Commission may require".

Briefly stated, defendant is attempting to invoke the doctrine of "primary jurisdiction", which provides that when Congress has created an administrative commission, board, or other agency with jurisdiction over and power to regulate some particular field of endeavor, courts cannot grant relief to any person complaining of any act done or omitted to have been done if the act or omission is of such nature as to be within the sphere of regulation of the administrative agency involved. Adler v. Chicago & Southern Air Lines, D.C.Mo., 41 F.Supp. 366.

In his excellent work on Administrative Law, Professor Davis has stated that the "fountainhead from which the entire primary jurisdiction doctrine flows" is the case of Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553. After discussing said case, he states:

"Questions which the courts call 'law' may appropriately be determined in the first instance by courts, because uniformity may be secured through review by a single Supreme Court, but the unifying influence of that Court can reach neither factual determination nor the exercise of specialized judgment. The line of cleavage is probably best stated by Mr. Justice Brandeis in Great Northern R. Co. v. Merchants' Elevator Co. (259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922)). 'Whenever a rate, rule or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission * * * To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past •been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function. Preliminary resort to the Commission is required alike in the two classes of cases. It is required because the enquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance

with many intricate facts of transportation is indispensable; and such acquaintance is commonly to be found only in a body of experts. But what construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute.'

"In the Merchants' case, the only question was the meaning of non-technical words in a tariff; there being no question of fact and no question requiring expert judgment, the Court held that preliminary resort to the Commission was unnecessary." Davis, Administrative Law Treatise, Vol. 3, Sec. 19.02.

It must be borne in mind that the Elkins Act is supplementary legislation to the Interstate Commerce Act. It is, in other words, part and parcel of the same specific, comprehensive, statutory scheme which Congress has enacted concerning the regulation of interstate commerce.

Specific authority has been given to the Courts to act in a situation such as that existing in the case at bar. Section 3 of the Elkins Act (49 U.S.C.A. § 43) provides in pertinent part:

"Whenever the Interstate Commerce Commission shall have reasonable ground for belief that any common carrier is engaged in the carriage of passengers or freight traffic between given points at less than the published rates on file, or is committing any discriminations forbidden by law, a petition may be presented alleging such facts to the district court of the United States sitting in equity having jurisdiction; * * * whereupon it shall be the duty of the court summarily to inquire into the circumstances, * * * and upon being satisfied of the truth of the allegations of said petition said court shall enforce an observance of the published tariffs or direct and require a

discontinuance of such discrimination by proper orders, writs, and process * * *."

■ In the case under consideration the Interstate Commerce Commission has administratively decided that defendant's deliberate slow lumber service is in violation of section 1 of the Elkins Act and section 6(7) of the Interstate Commerce Act and has requested the Attorney General to direct the District Attorney to institute this case.. The statutory language places the duty of inquiry upon the Court, and empowers the Court to enforce its decision by proper order.

In Great Northern R. Co. v. Merchants' Elevator Co., [259 U.S. 285, 42 S.Ct. 479] referred to in the above quotation from Professor Davis' treatise, the Supreme Court held that where the question is simply one of tariff construction the courts may pass on it as an issue "solely of law". This doctrine was affirmed by the Supreme Court in the case of United States v. Western Pacific R. Co., 1956, 352 U.S. 59, 77 S.Ct. 161, 167, 1 L.Ed.2d 126, wherein the Court stated:

"By no means do we imply that matters of tariff construction are never cognizable in the courts. We adhere to the distinctions laid down in Great Northern R. Co. v. Merchants' Elevator Co., supra, which call for decision based on the particular facts of each case. Certainly there would be no need to refer the matter of construction to the Commission if that body, in prior releases on opinions, has already construed the particular tariff at issue or has clarified the factors underlying it."

In the case of City of Yonkers v. United States, 1944, 320 U.S. 685, 64 S.Ct. 327, 330, 88 L.Ed. 400, the Supreme Court, while deciding that the commission should make jurisdictional findings under Section 1(22) of the Interstate Commerce Act relative to abandonments of rail lines or its order thereunder

should be set aside on review by the courts, nevertheless pointed out:

"It is settled that the aid of the Commission need not be sought before the jurisdiction of a court is invoked to enjoin violations of the provisions in question. Texas & Pacific Ry. Co. v. Gulf, C. & S. F. Ry. Co., 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578."

By the same token, there is no reason why the aid of this Court cannot be invoked to enjoin violations of Section 6 (7) of the Act.

Referring to the quoted language in United States v. Western Pacific R. Co., supra, it is apparent that the Interstate Commerce Commission has "already construed the particular tariff at issue or has clarified the factors underlying it."

In Chicago, Milwaukee, St. Paul & Pacific Railroad v. Spokane, Portland & Seattle Railway Company, May, 1957, 300 I.C.C. 453, at page 487, where the question involved was the establishment of certain routes and rates, the Commission stated:

"We have never condemned reasonable transit or diversion privileges, such as stopping for partial unloading and unloading, the diversion of a car from one destination to another, stopping for milling or fabrication, or storage, where the nature and sale of a commodity require such privileges, but the improper use of freight cars has been looked upon with disfavor. While it is not within our province to pass upon the respective merits of the two methods of merchandising lumber; namely, firm sales and transit sales, the deliberate routing of traffic so as to slow the movement thereof is a practice which cannot be regarded as in the public interest."

As early as 1917, the Commission stated in Reconsignment Case, 47 I.C.C. 590, at pages 623–624:

"Retail lumber dealers, with investments in yards and stock aggregating many millions of dollars, appeared in active support of the proposed charges for reconsigning lumber. Their position is that the exaction of the same freight rates on their direct shipments as are charged the wholesale dealers for transportation between the same points, with the additional service of reconsignment, is discriminatory. They allege that under present practices the wholesale dealers are permitted to use without expense to them the railway equipment and yards for the storage of their stocks, while the retail dealers must provide their own storage facilities at great expense. The fact that shippers are able to derive an advantage over competitors through the service of the carriers is, of course, not in itself a reason for condemning a transportation practice. *It is alleged, however, that shipments are delayed through causes not arising from transportation. When a shipment reaches a hold point unsold and the market is rising, the dealer has an incentive to hold his shipment awaiting a further advance in price. On a falling market, on the other hand, the customer defers his purchase. In either case, it is said, the car is detained, the terminal congested, and other shippers deprived of the use of the carrier's equipment and other facilities. Delays arising from such causes are to be unqualifiedly condemned.* The fact that many of the wholesale lumber dealers reconsign practically all of their shipments, while the eastern grain dealers, whose situation has been discussed, reconsign only from 20 percent to 25 percent of their shipments, indicates a radically different cause and purpose of the reconsignments in connection with the two classes of traffic. The possibility of such results of the carriers' present practices supports the belief that adequate compensation for the full period of detention awaiting orders and, if necessary, a penalty in

addition, are in the public interest." (Emphasis supplied.)

In the Export Grain Storage Charges Case (1917) 42 I.C.C. 530, the Commission considered the holding of grain cars in transit at the request of the shipper, just as lumber cars are held in the instant case. The Commission stated that such holding of cars was an "extra service" for which a charge should be made.

In American Paper & Pulp Association v. B. & O. R. R. Co., 41 I.C.C. 506, the Commission stated:

"In order to prevent overcharges and discriminations under the pretext of additional services, Congress enacted in section 1 that the entire body of such services, many of them, according to the theory of the common law, separable from the carrier's service as carrier, should be included within the single term "transportation" and be subject to the provisions of the act respecting reasonable rates and the like. And by section 6 no carrier may extend 'any privileges or facilities,' save as these have been duly specified. *But the primary duty of a carrier is to carry. And it is not the duty of a carrier, as such to furnish storage* beyond the reasonable time necessary for unloading or removal. * * * *A rule which permits the shipper to use valuable facilities of the carrier for unlimited periods, while seeking to find markets for the goods stored or while awaiting the convenience of the consumer, is not a proper rule, and the practice, as complainant charges, is beyond the functions of a common carrier."* (Emphasis added.)

In the case of Turner, Dennis & Lowry Lumber Co. v. Chicago, M. & St. Paul Ry. Co., 2 F.2d 291, 296, and 271 U.S. 259, 262, 46 S.Ct. 530, 70 L.Ed. 934, both the District Court and the Supreme Court condemned the use of freight cars for the storage of lumber while the shipper sought a market. Both courts pointed out that such storage constituted privileges and advantages to the shipper beyond the ordinary duties of a carrier.

The District Court in that case stated [2 F.2d 295]:

"It appears in this case that a great shortage of cars existed; that this evil was increased by the practice of a large body of lumber dealers to detain cars for an unreasonable period while they were negotiating sales to be effected through reconsignments. From the report of the Commission in this case (American Wholesale Lumber Ass'n v. Director General, 66 Interst. Com. Com'n R. at page 406) it appears complainants insisted that:

" 'Operators of the small mill, who are limited as to capital and credit, are unable to carry lumber in stock for long periods; that it is impossible for them to sell on credit; that their limited output will not warrant the heavy cost of a sales organization; that they are unacquainted with traffic matters and market conditions; that they must ship their lumber as soon as it is available and must realize their return quickly; and that therefore it is vital to the continuance of their business to have the right to reconsign without any restriction of that right by the imposition of a penalty charge when cars are delayed beyond a specified limit.'

"It is also urged upon the Commission:

" 'That the unrestricted use of the reconsignment privilege is beneficial to the small lumber retailer in that, by being able to purchase cars of lumber in transit, quickly available to meet his needs, he requires less capital and less yard space, and can maintain a better rounded as well as a smaller stock on hand,' etc.

"It is evident from this that by such use of railway facilities such dealers sought to escape the natural disadvantage of small capital and inadequate facilities of their own.

Of such reasons the law can take no cognizance. It does not seek to equalize natural conditions by special privileges and advantages to an individual shipper or class of shippers. The framers of the Demurrage Code refused to allow the circumstances of the particular shipper to be considered and refused to exempt shippers from demurrage charges because of conditions peculiar to them. Pennsylvania R. Co. v. Kittaning Iron & Steel Mfg. Co., 253 U.S. 319, 323, 324, 40 S.Ct. 532, 64 L.Ed. 928; Texas & Pacific Ry. Co. v. Interstate Commerce Commission, 162 U.S. 197–218, 16 S.Ct. 666, 40 L.Ed. 940. The carrier is not called upon to contribute its trackage and equipment for such purposes, nor is the shipping public required to suffer the resulting loss of transportation facilities."

The Supreme Court, in affirming the lower court's decision stated [271 U.S. 259, 46 S.Ct. 531]:

"Preliminary resort to the Interstate Commerce Commission was unnecessary, because no administrative question is presented. Great Northern R. Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943."

and:

"One cause of undue detention is lack of promptness in loading at the point of origin or in unloading at the point of destination. Another cause is diversion of the car from its primary use as an instrument of transportation by employing it as a place of storage, either at destination or at reconsignment points, for a long period while seeking a market for the goods stored therein. To permit a shipper so to use freight cars is obviously beyond the ordinary duties of a carrier."

The defendant in the instant case maintains and argues that it must delay lumber shipments to meet the competition of the other carriers with longer lines. But is this necessarily true?

Even if the longest circuitous route were taken between a point in the Northwest and Council Bluffs, Iowa, would it require 14 more days in transit than a direct shipment over defendant's lines? It does not appear to the Court that such would be the case. The longest route would be something around 1,000 miles longer than defendant's direct route, and the evidence before the Court is that the normal running time between Ogden, Utah, and Council Bluffs, Iowa, a distance of some 900 miles, is from 2 to 4 days.

Also, if the delay being practiced by defendant is only to meet competition, why have some six other competing carriers published tariffs (which have been suspended pending a hearing) in which they, too, are seeking to provide a 14-day delay for shipments of lumber without charge? It seems more reasonable to this Court that not only the defendant, but also the competing carriers with longer lines, are trying to favor those small mills and wholesalers who do not have storage facilities of their own.

In the case of Chicago and Alton Railroad Company v. Kirby, 225 U.S. 155, 32 S.Ct. 648, 650, 56 L.Ed. 1033, the Court, after reciting the provisions of Section 1 of the Elkins Act, stated:

"The implied agreement of a common carrier is to carry safely and *deliver at destination within a reasonable time. It is otherwise when the action is for a breach of a contract to carry within a particular time*, or to make a particular connection or to carry by a particular train. The railroad company, by its contract, became liable for the consequence of a failure to transport according to its terms. Evidence of diligence would not excuse. If the action had been for the common-law carrier liability, evidence that there had been no unreasonable delay would be an answer. But the company, by entering into an agreement for expediting the shipment, came under a liability different and

more burdensome than would exist to a shipper who made no such special contract.

"*For such a special service* and higher responsibility *it might clearly exact a higher rate. But to do so it must make and publish a rate open to all. This was not done.*

"The shipper, it is also plain, was contracting for an advantage which was not extended to all others, both in the undertaking to carry so as to give him a particular expedited service, and a remedy for delay not due to negligence.

"*An advantage accorded by special agreement which affects the value of the services to the shipper and its cost to the carrier should be published in the tariffs;* and for a breach of such a contract, relief will be denied, because *its allowance without such publication is a violation of the act.* It is also illegal because it is an undue advantage, in that it is not one open to all others in the same situation.

\*   \*   \*   \*   \*   \*

"The broad purpose of the commerce act was to compel the establishment of reasonable rates and their uniform application. That purpose would be defeated if sanction be given to a special contract by which any such advantage is given to a particular shipper as that contracted for by the defendant in error. *To guarantee* a particular connection and *transportation by a particular train was to give an advantage or preference not open to all, and not provided for in the published tariffs.* The general scope and purpose of the act is so clearly pointed out in New York, N. H. & H. Railroad Company v. Interstate Commerce Commission, 200 U.S. 361, 391, 26 S.Ct. 272, 50 L.Ed. 515 and in Texas & P. Railroad Company v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, as to need no reiteration.

"That the defendant in error did not see and did not know that the published rates and schedules made no provision for the service he contracted for, is no defense. For the purposes of the present question he is presumed to have known. The rates were published and accessible, and, however difficult to understand, *he must be taken to have contracted for an advantage not open* to others. Texas & P. Railway Co. v. Mugg & Dryden, 202 U.S. 242, 26 S.Ct. 628, 50 L.Ed. 1011."

While the Kirby case involved an agreement for expedited service, the principles laid down therein were cited in Eastern Shore of Virginia Produce Exchange v. New York, P. & N. R. Co., 1925, 141 Va. 611, 126 S.E. 674, 676, holding that under Section 1 of the Elkins Act it was unlawful for a carrier to *delay* the arrival of shipments to give a shipper the advantage of a better market price. The Court said:

"No special rate has been shown to have been published for special contracts to delay shipments, and hence no shipments could legally be delayed.

"If it is unlawful to contract to expedite a shipment, it is unlawful to contract to delay it."

It might be argued no one is hurt by delaying a shipment because the ultimate consumer of the lumber cannot complain because the cost of the lumber he buys is exactly the same, insofar as the cost of transportation of the lumber is concerned, whether the lumber is shipped in the normal course of business or in a delayed shipment. This may be true, but who does ultimately pay for the delayed service? The defendant carrier admits that the transportation cost of a delayed shipment is greater than that of a normal shipment, and the evidence submitted to the Court discloses that the increased costs over a period of time amount to a very substantial sum. Someone has to pay for the increased costs, and it appears to the

Court that the general public, when shipping anything or when buying anything shipped by the defendant, must ultimately pay for the increased cost of operating the defendant railroad.

It is obvious to the Court that the giving of delayed service must be of some advantage to the "roller lumber" dealer. Why else would he ask for the delayed service? The giving of an advantage is prohibited by Section 1 of the Elkins Act. The extension to any shipper of any privileges or facilities in the transportation of property, without specifying same in the published tariffs, is prohibited by Section 6(7) of the Interstate Commerce Act.

Defendant maintains that it does not have to publish its delayed service schedules in tariff form. With this contention this Court cannot agree. If the defendant does not have to publish that it will delay shipments for a period of 14 days, what would prevent the defendant from offering a delay of 30, 60 or 90 days?

It is the function of the Interstate Commerce Commission to determine whether or not a delay in service is reasonable under all the facts and circumstances involved. Perhaps in certain instances, a delay in service would be reasonable in order to meet the competition of competing carriers with longer physical routes. But how can the Interstate Commerce Commission ever rule upon the reasonableness of some proposed delay in service if it is never published? The Commission must have some proposed tariff presented before it can rule upon same; otherwise the question never would be properly before the Commission.

This Court wants it to be clearly understood that it is not hereby holding that the 14-day delay in service now being practiced by the defendant is unreasonable. What this Court is holding is that any intentional delay in service offered by defendant must be published in tariff form, so that the Interstate Commerce Commission can then determine if

such delay is reasonable or unreasonable under the circumstances.

This Court therefore makes the following:

Conclusions of Law

1.

This Court has jurisdiction of the subject matter and of the parties.

2.

The defendant's offering, agreeing upon and giving of delayed lumber service to certain transit wholesalers and dealers in lumber for the purpose of inducing said transit lumber wholesalers and dealers to ship upon defendant's lines to the exclusion of competitors, and each and all of such acts constitute a device for the offer and gift of rebates, concessions, advantages, and discriminations in violation of the Elkins Act, whereby the lumber transit shippers have been offered and given and will be offered and given concessions which enabled and will enable them to transport freight in interstate commerce by common carrier by railroad at less than the published rates on file with the Interstate Commerce Commission and whereby such transit shippers of lumber have been given and will continue to be given advantages, and whereby discrimination is practiced in favor of such transit lumber shippers, all in violation of the Elkins Act. Title 49 U.S.C.A. § 41; Chicago and Alton Railroad Company v. Kirby, 225 U.S. 155, 32 S.Ct. 648, 56 L.Ed. 1033; Eastern Shore of Virginia Produce Exchange v. New York, P. & N. R. Co., 1925, 141 Va. 611, 126 S.E. 674, 676; Louisville & Nashville R. Co. v. Warren County Strawberry Growers' Association, 1925, 206 Ky. 482, 267 S.W. 551, 552; Davis v. Cornwell, 1924, 264 U.S. 560, 44 S.Ct. 410, 68 L.Ed. 848; United States v. Michigan Portland Cement Co., 270 U.S. 521, 522, 524, 46 S. Ct. 395, 70 L.Ed. 713; Baltimore and Ohio R. R. Co. v. United States, 305 U. S. 507, 59 S.Ct. 284, 83 L.Ed. 318; United States v. P. Koenig Coal Co., 270 U.S. 512, 46 S.Ct. 392, 70 L.Ed. 709; Penn-

sylvania R. Co. v. International Coal Mining Co., 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446.

3.

■ The defendant's giving of delayed lumber service to certain transit wholesalers and dealers in lumber for the purpose of inducing said transit wholesalers and dealers to ship upon defendant's lines to the exclusion of competitors, constitutes a device by which defendant extended and will continue to extend to lumber transit shippers, privileges and/or facilities in the transportation of property such as are not specified in published tariffs, such acts being in violation of Section 6(7) of the Interstate Commerce Act and Section 1 of the Elkins Act. Title 49, U.S.C.A. §§ 6(7), 41; Pennsylvania R. Co. v. International Coal Mining Co., 230 U.S. 184, 196, 197, 33 S.Ct. 893, 57 L.Ed. 1446; Chicago and Alton Railroad Company v. Kirby, 225 U.S. 155, 32 S.Ct. 648, 56 L.Ed. 1033; Davis v. Cornwell, 1924, 264 U.S. 560, 44 S.Ct. 410, 68 L. Ed. 848; Atchison, T. & S. F. Ry. Co. v. Springer, 7 Cir., 1949, 172 F.2d 346, 350; Siebert v. Erie R. Co., 1919, 189 App.Div. 586, 179 N.Y.S. 136, affirmed 1921, 232 N.Y. 517, 134 N.E. 553; Louisville & Nashville R. Co. v. Warren County Strawberry Growers Ass'n, 206 Ky. 482, 267 S.W. 551, 552; Turner, Dennis & Lowry Lumber Co. v. Chicago, Milwaukee & St. Paul Railway Co., 1926, 271 U.S. 259, 262, 46 S.Ct. 530, 70 L. Ed. 934.

4.

■ The defendant's claimed defense that its granting of delayed lumber service was the result of competitive necessity, provides no legal defense to this action. Turner, Dennis & Lowry Lumber Co. v. Chicago, Milwaukee & St. Paul Railway Co., D.C., 2 F.2d 291, 296, affirmed 271 U.S. 259, 46 S.Ct. 530, 70 L.Ed. 934; Chicago, St. P., M. & O. Ry. Co. v. United States, 8 Cir., 162 F. 835, certiorari denied 212 U.S. 579, 29 S.Ct. 689, 53 L.Ed. 659; Wisconsin Central Ry. Co. v. United States, 8 Cir., 169 F. 76; Chicago, B. & Q. R. Co. v. United States, D.C., 98 F.Supp. 119, 122, affirmed 342 U.S. 845, 72 S.Ct. 80, 96 L. Ed. 638; Allowances on Cottonseed at Columbus & Greenville Railway Points, 238 I.C.C. 309, 315, sustained in Interstate Commerce Commission v. Columbus & Greenville Ry. Co., 319 U.S. 551, 63 S.Ct. 1209, 87 L.Ed. 1580.

5.

The defendant's claimed defense that delayed lumber service is a matter of long established custom, provides no legal defense to this action. Atlantic Coast Line R. Co. v. Clinchfield Fuel Company, D.C.S.C.1951, 94 F.Supp. 992; Eastern Shore of Virginia Produce Exchange v. New York, P. & N. R. Co., 1925, 141 Va. 611, 126 S.E. 674, 676.

6.

■ The purpose of the Interstate Commerce Act and the Elkins Act was to outlaw every subterfuge, plan, scheme, or device formulated by or participated in by any person or corporation to give rebates, concessions, advantages, and discriminations to shippers in respect to interstate transportation by carriers subject to the Elkins Act and the statutes were designed to strike down every device without exception no matter how ingenious or labyrinthian, by which these objectives are sought to be accomplished. These statutes are intended to strike through all forms, pretenses, and subterfuges to reach and eradicate the forbidden evil. Armour Packing Co. v. United States, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681; United States v. P. Koenig Coal Co., 270 U.S. 512, 519, 46 S.Ct. 392, 70 L.Ed. 709; Louisville & Nashville R. R. Co. v. Mottley, 219 U.S. 467, 478, 31 S.Ct. 265, 55 L.Ed. 297; United States v. Hocking Valley R. R. Co., D.C., 194 F. 234.

■ The present proceeding is civil in nature, and the acts complained of—whether done willfully or not—may be restrained and enjoined as to the future. United States v. Union Stock Yards, 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226; Union Pacific R. Co. v. United States,

313 U.S. 450, 61 S.Ct. 1064, 85 L.Ed. 1453.

A permanent injunction should issue as prayed for in the complaint.

Upon the foregoing findings of fact and conclusions of law the court directs that a judgment be entered for a permanent injunction and that a form of entry be prepared by counsel for the plaintiff in accordance with the views indicated by the Court, and said form submitted to the Court.